Case 24-5384, USA v. William Siefert and 24-5385, USA v. Timothy Ainge. Oral argument, 10 minutes for each defendant, 20 minutes for the plaintiff. Mr. Ferrara for the appellate. Good morning, your honors. May it please the court, Michael Ferrara on behalf of defendant appellate William Siefert. And as I understand it, the time split is going to be eight minutes for you, is that correct? Yes, Judge Davis. All right, and how much time are you reserving for rebuttal? Two minutes, your honor. The fundamental error in Dr. Siefert's trial was straightforward. The jury heard voluminous evidence of patient deaths that were unquestionably not relevant to any issue before the jury. By definition, this evidence was therefore inadmissible. The evidence was also spectacularly prejudicial in that it pertained exclusively to allegations that Dr. Siefert contributorily caused the death of four people. Accordingly, the cumulative effect of the serial introduction of irrelevant and prejudicial death evidence so infected the trial with unfairness as to make Dr. Siefert's trial fundamentally unfair and his conviction a denial of due process, which is the Supreme Court standard from Darden v. Wainwright. The problem I have with that is that your client was acquitted of the controlled substance charge, weren't they, by the jury? He absolutely was. And the death business, who died from drug overdoses, pertained to that particular charge. So how is it prejudicial when the jury acquitted him? It is in multiple ways, Judge Gilman. The standard for prosecutorial misconduct or even the standard for a plain error analysis requires this court to look at whether the trial itself was fundamentally fair, whether the public could have confidence in that judicial proceeding. During this trial, the government presented the urinary drug testing fraud scheme and the prescribing conspiracy that they alleged as inextricably intertwined. Throughout the trial, the government's position was that Dr. Siefert prescribed opioids to patients effectively to get them in the door, to open a revenue stream, to allow those same patients to be tested for urinary drug analysis. By combining those two topics throughout the trial, the government primed the jury to consider those as one. And so the government presented evidence that was unquestionably irrelevant as to the drug trafficking conspiracy or any of the substantive evidence. They presented evidence of seven deaths, did they not? They did, Judge Gilman. Three of the deaths, in fact, there was proof that your client was aware that those people had died. Well, Judge Gilman, there was proof that Dr. Siefert was aware of deaths in a generic sense. The evidence as to Dr. Siefert's specific knowledge, and I'm divorcing that from institutional knowledge on behalf of the clinic, the evidence that was introduced by the government directly related to Dr. Siefert's knowledge was limited to three witnesses who testified to general conversations regarding a patient death. None of those three witnesses specified which death they were talking about. The evidence related to the three patients that your honor described was also quite limited. With respect to one patient, there was evidence that the patient's family had called the clinic and had a substantive conversation about the circumstances of her death. But for the other two, Teresa Ilg and Michael Casebolt, the evidence was limited to simple notations in their file with the evidence related to Mr. Casebolt, a single word, deceased. It didn't have any information about a cause of death. It didn't have any information about the timing of his death. It was simply a single word, deceased, written into the margin of a medical record of some sort. All of the death evidence, therefore, related to the four patients where all parties and the district court agreed that there was no evidence in the record whatsoever that Dr. Siefert was aware that those patients had passed away. And even with respect to Mr. Casebolt, where it's just that one single word, all of that evidence is irrelevant and spectacularly prejudicial. And the district court actually put its finger on the danger of having that evidence before the jury. During the charge conference, when the parties were discussing what the rules of the road would be for closing argument, the district court went through an appropriate analysis of whether or not the government should be permitted to argue about those four patient deaths. Prior to that, and I skipped an important step, prior to that, once the parties and the court agreed that there was no evidence in the record related to Dr. Siefert's knowledge, Dr. Siefert moved for all of that evidence of the four patient deaths to be stricken from the record. The district court denied that motion. Dr. Siefert then moved for a mistrial. The district court denied that as well. I guess I'm, I understand what you're saying, but I don't, I still, I don't understand what your answer is to basically the nub of Judge Gilman's question, which is if your client was actually acquitted on the diversion aspects of this trial, or on those counts that were associated with the illegal prescribing, you're not, are you saying that the death evidence was irrelevant to those counts? The death evidence was irrelevant to all counts. Yes, Judge Davis. So why was it irrelevant to the diversion counts, which ultimately he was acquitted of in any event? It was irrelevant to the diversion counts because the district court issued a very explicit pre-trial instruction, read to the jury and the parties, that for that evidence to be admissible, it had to be tethered to the defendant's knowledge. It was introduced for the limited purpose of knowledge and intent, and the district court expressly informed the parties and the jury that if there was no evidence of that knowledge, that evidence was to be disregarded. The government knew that pre-trial, so the government made a conscious decision, therefore, to introduce irrelevant evidence, evidence that four people had died. The danger, and getting back to Judge Gilman's question as to why the acquittal doesn't solve this problem, is we don't know and we can never know how the jury came to make its decision. The reason why the court, this circuit court, has framed prosecutorial misconduct and even plain error as an analysis of the integrity of the proceedings is because of that uncertainty, because the public needs to have confidence that this trial was fair. Wasn't there a limiting instruction given by the judge? There absolutely was, Your Honor, and the jury was expressly told to disregard any evidence that the jury in their discretion did not believe was tethered to Dr. Seifert's knowledge. However, because it related to four people dying and because the government put these prescribing conspiracy and urinary drug testing conspiracies together throughout the trial, the danger is just too great. What's the best case that supports you for this theory of yours? The best case is the prosecutorial misconduct, Judge? Yeah. I would say it's really just this court's decision in Francis that announces the standard of what the court looks to in analyzing prosecutorial misconduct. That's general standards. You don't have a case directly on point then. We do not, Your Honor, and we think that's for good reason, that the case law on prosecutorial misconduct is generally limited to isolated comments, government vouching. This goes far beyond that, Judge Gilman, and I notice I'm out of time. If I could continue answering the court's question. This goes far beyond that issue. This was, again, a premeditated decision by the government to introduce not one but two experts to call decedent family members, all for evidence that they knew going into this trial had to be irrelevant by definition and spectacularly prejudicial. The danger is that the jury just could not separate those two and convicted Dr. Seifert of fraud, not because they believed that he committed fraud, that evidence was also weak, but because they were overwhelmed by the death of these four people. I understand your argument. Thank you, Judge. Good morning, and may it please the court. Ronald Chapman on behalf of Dr. Timothy Ain, and I've reserved five minutes for rebuttal. The evidence in this case was insufficient to convict both defendants, but particularly my client, because the government conflated a local coverage determination created by a private contractor with a medical standard. Then it had experts use that medical standard that it created on the witness stand in order to convince the jury that a violation of a local coverage determination amounts to per se health care fraud. Then, when the defendants asked the judge to instruct the jury that a violation of these local coverage determinations does not amount to fraud, the judge refused and denied giving the instruction. Where is it in the record that the LCDs were per se fraud? I would go to Dr. Berman's testimony, and I'll see if I can find a site, Your Honor. But particularly, Dr. Berman indicated that you have to follow these, I'm paraphrasing, you have to follow these, otherwise it's not medically necessary. Now, the government's argument was that... I think that shows that it's evidence of fraud, but that it's per se fraud. I don't know that I saw that in the record. The government then later argued that the lack of medical necessity, that issuing an order for a test that was not medically necessary amounts to fraud, and that's what the jury was instructed on. What the jury didn't receive from the judge in this case, which is an instruction that has been routinely given in the Sixth Circuit, what they didn't receive was an instruction that said, civil rules, regulations, and specifically these types of determinations do not amount to fraud. If we look at the prosecution's closing argument as well as its rebuttal, they leveraged this determination as if it was a hard and fast medical standard. Now, the government was required to show that the ordering provider believed the tests were not medically necessary. That's Dr. Seifert. Dr. Ain, my client, is a chiropractor. He's not a physician who orders urine drug tests. The government would have had to show that he also was aware that the provider believed these tests were not medically necessary, and the way they did that was by saying that each and every one of them was a violation of the LCD. They did that without doing any sort of analysis. Medicare requires audits and extrapolation in order to determine whether or not there was fraud or a loss. The government didn't do that. They cherry-picked specific claims to make it appear as if those claims lacked medical necessity. Well, they did more than that because there was evidence from several former employees that Dr. Ain was saying, hey, let's test every patient for the maximum urinary drug testing, right? Yes, that's correct. The primary witness for that was Ms. Hastings. Interestingly, Ms. Hastings worked at the practice in 2013 to 2014, outside of the time period of the alleged conspiracy. During the time period of the alleged conspiracy, WellCare, who was, and this is an issue we've raised on appeal as well, was represented by my client's counsel as well. WellCare did not raise any issues with the way that tests were being ordered or with the frequency and the billing code that they were using in order to order those tests. And that's important because if the government stands on the idea that lay witnesses and employees knew that these were not medically necessary, it's rebutted by the fact that every provider in the practice ordered these tests and believed they were medically necessary, but also because there were audits, there were investigations, there were inquiries into the practice, and the government raised no evidence during trial that WellCare had this specific problem. WellCare had other problems with the tests, but not this specific problem. With my last 40 seconds, I would just like to raise the conflict issue, which is a very important issue for us. Dr. Ane should receive a fair trial, and what that means is he should be able to call the witnesses necessary to secure his acquittal. Judge Bunning, during the conflict waiver hearing, indicated that he did have some concerns, but it appears that he believed that you could ameliorate this problem by perhaps calling other witnesses and still get the case to the jury by the 26th. Isn't it an important factor that your client, you know, I think he signed the waiver and also testified and waived any conflict? He did, and I'm out of time, but may I provide an answer?  I believe it was weeks before trial, he's funneled his entire defense through this one defense counsel and spent virtually every dime he had, and he was asked by a judge whether he knowingly and intelligently waived a conflict. The only way that you could knowingly and intelligently waive that conflict is if you knew what witnesses were going to be called at trial, you knew the evidence that was going to be presented at trial, and you knew the legal theories that would be left off the table because you had conflicted counsel. That is a very difficult decision for us to expect a lay person to make when they're facing such a serious situation. But isn't that what we do expect them to make? That is a decision we expect them to make. Otherwise, we couldn't rely on waivers ever, right? I think that we should be able to rely on waivers provided they're knowingly and intelligent, and in this case, the judge should have stepped in to know. There was absolutely no way that an attorney who represents a victim in the case can also represent the defendant in the case. I've never seen that happen, and that would not be a knowingly and intelligent waiver. Thank you. Thank you. May I proceed? Thank you. Thank you. May it please the Court. I'd like to just address in this order the LCD issue and the local coverage determination issue and the conflict issue raised by Mr. Chapman and then proceed to the misconduct issue in that order if that's appropriate. First, briefly, on the local coverage determination issue, the scope of what this court actually has to find is quite narrow. We're talking about a jury instruction that said that the only person bound by an LCD is the contractor that issued it. That's the language that was in the instruction. The question before this court under the Williams case, Sixth Circuit case, is whether that was a correct statement of the law, whether that was substantially covered by other instructions, and whether it would have impaired the defense to not have that instruction. This is not a case, as Mr. Chapman was suggesting, this is not a large admin law case, what is the binding nature of LCDs. Was that jury instruction okay? And on all three of those elements of the test in Williams, it fails. It wasn't a correct statement of the law because it didn't capture that LCDs are entitled to deference, and it was actually incorrect in that, in many instances, the LCD is binding. It's binding if you do not appeal. So on the first step of the Williams test, it fails. Second stage is, was it substantially covered by other instructions? I think that the expert and lay witness credibility instructions covered it. And then on the third point, as the motions panel in this case also recognized, there was, this was not a case that rose or fall on the LCD. The proof of trial was that the Medicaid policies and guidelines were getting violated. They require individualization. There was no individualization here. The Kentucky Board of Medical Licensure guidelines were also violated. And then you have on top of all of that, something that hasn't been talked about yet today, the defendants were testing on a malfunctioning machine that was showing that 70-year-old grandmothers were testing positive for heroin and meth and all sorts of other substances. This was brought to the attention of the defendants. There were all sorts of other portions of misconduct, both in the 2017 to 2018 period, when Dr. Seifert was at the clinic, and then in 2020, things got much worse. When Dr. Ein himself was operating the machine, he wasn't performing adequate calibration on the machine. It was, again, producing unreliable results, and then it wasn't producing any results because he didn't have enough time to run the machine. So those are the, not having that bit of information, not having sort of additional information from the LCD, that would not have made a difference in this trial. Second point on the conflict issue. We raised the Davis case about waivers. The Davis case talks, I think, about concurrent representation of two defendants. The waiver was adequate in that case. Here, the waiver was adequate under the precedent set by this court. And you can even look to one of the defense cases that Mr. Chapman cites, the Collins case, says quite rightfully, defendants can't have it both ways. They can't both sort of invoke after-trial ineffective assistance because they signed a waiver, because if that were the case, it would just say sort of at trial, right, like I wanted to have Mr. Glassman in this case try the case, but I was denied my choice of lawyer. But the fact of the matter is Dr. Ayn wanted Mr. Glassman. Mr. Glassman is a very respected member of this bar. He was a former U.S. attorney, got a lot of trial experience. He was the choice for the defendant. Dr. Ayn and Dr. Ayn waived any sort of conflict there. So what about Mr. Chapman's point? I mean, I asked him the question, well, when can we ever rely on waivers? But to credit his point, one of the things that I took him to be saying was that, well, he didn't really know what all he was waiving. He didn't know what witnesses wouldn't be called as a result of the conflict that was there. Should we be concerned about that? And if not, why not? Well, I don't even think you need to. I think that he was, first, I think that in this case, not to sort of fight your hypothetical, but in this case he was warned of the specific issue that he's now raising after trial. Again, you could look to the notice that was filed. I don't have the record site in front of me, but the United States filed a very robust ten-page notice saying, listen, Mr. Glassman, Mr. Glassman's firm, excuse me, Patten Boggs, represented well care in litigation, potential litigation against this clinic. That could cause a problem with how zealously Mr. Glassman would argue against a well care witness that the government had anticipated putting on at that time. That was the crux, and it's laid out in quite a bit of detail of the government's claim there, and it related to Rule 404B evidence that the government had also noticed at that point. I gather Mr. Glassman, his firm represented well care, but he wasn't involved. Mr. Glassman was U.S. attorney for, I think, the Southern District of Ohio at the time of that litigation, and he was not involved. He made representations that I don't think anyone would question, that he had no involvement in that prior matter. It just so happened that he later went to the same firm that had represented Centene. I believe one of his associates might have had some work on Centene, but again, unrelated matters. So the straightforward way to resolve, I think, this claim is the waiver is adequate under cases like Davis or even a case like the defendant's site, like Collins. And then even if that's not the case, there was no true conflict here because as the district court correctly found, these were just competing economic interests, and under the state law, which this court would look to to determine conflicts of interest, it was not clearly erroneous for the court to find that, listen, there could be competing economic interests here. But I don't think we even have to reach that second issue because of the waiver. I can move to the prosecutorial misconduct point. Before death's business, right? I think now it is, right? Before, the prosecutorial misconduct claim seemed to have been wider, right? The prosecutorial misconduct claim was improper argument in both of the jury addresses and proffering testimony from Dr. Thomas that was unqualified. Those claims are also, we think that they also failed. Dr. Thomas was qualified. And the jury addresses, there were no objections during the jury addresses, and the jury addresses even conformed to what the defendant's view of the law was as to the closing. And there are just insufficient record sites for me to fully sort of address those two claims of prosecutorial misconduct as to the four deaths. Here was the state of the law when this case was being litigated. I'd point this court to the Hofstetter case. It's an Eastern District of Tennessee case that the government relied on, starting in the motions practice. The government filed a 40-page, some-odd-page response to motions in limine to exclude the death evidence. Well, can I ask you, so the district court did say that any evidence that you're going to put on concerning the deaths has to be tethered, or you have to show that there was knowledge there. So there were these additional death evidence that came in where apparently there was not enough to show knowledge. Why did that happen, and should that concern us? I do not believe it should concern you for two reasons. So first, this was a case about patients at a clinic who were supposed to be showing up every 30 days, and then they died and they stopped showing up, and there was no follow-up on that issue. They had this repeat expectation of needing, purportedly, this very important medication from the clinic, and they just ceased to show up. There was also evidence in the record of the clinic's knowledge of patient deaths, and it was specific as to... But we're not so much... I mean, we're concerned with these doctors' knowledge, right? We are concerned with these doctors' knowledge or their deliberate ignorance, which I think is the... So is that what you're getting at, that you were trying to show deliberate ignorance? Yes, yes, and if you look at the Hofstadter case, the question for this court that Mr. Ferrara said it's unquestionably irrelevant evidence, if we had put the same facts before the Hofstadter court, the Hofstadter court would have said, this evidence is relevant to establish knowledge, at the very least under a deliberate ignorance theory. We quote language directly from Hofstadter, which says, I think it has a tendency to show that the clinic knew or was deliberately ignorant of the fact that deaths were occurring. And then as to further evidence of that deliberate ignorance, we would point to the expert testimony of Dr. Thomas and one of the practitioners at the clinic, Dr. Jackson, who actually left the clinic after a short period of time because of his concerns about the opioid prescribing. Dr. Thomas said, a death is a sentinel event. It is an important event that should cause you to audit what is going on at the clinic, and that didn't happen. Dr. Jackson tried to perform his own audit, and he was turned away from doing it. So the deliberate ignorance theory under Hofstadter, that was what we had relied on. But in addition to that, the district court, the question before this court, isn't whether or not the evidence was relevant. It's whether the prosecutors knew that it wasn't relevant under an order of the court and then deliberately tried to introduce that evidence anyway. That is a higher standard as they've framed their claim. The response to that is the government had a good faith basis under cases like Hofstadter and this deliberate ignorance theory to present that evidence. The district court multiple times agreed with that position. At the pretrial conference, all of the government's proof, the evidence of those three notations in three of the patient files and the concededly less specific evidence of other patient deaths was put before the court. The court's response was, this is sufficient for knowledge. That is a quote from the pretrial motions hearing. The same issue comes up during trial multiple times. We highlight one case, I think it was the morning before several of the next of kin were going to testify. And in that instance, again, the relevancy of that testimony was litigated. The government was again transparent. This is our proof. We've got these three notations. We've got evidence of deliberately ignoring other information. And actually, sorry, one other point we have is that defendant Seifert, we have evidence that he lied to the KVML about patient deaths. He was put on notice. There was proof in trial that he was put on notice of patient deaths. And he stated to the KVML that I have never, quote, never been associated with a patient overdose death. That was a lie. That was concealment. So we have those types of issues, that proof, and the limits of that proof, was put before the district court several times. And the district court repeatedly said, that knowledge is sufficient. Finally, in the post-trial motions, the district court again said, you've raised this claim after trial as a prosecutorial misconduct claim. Again, the district court said, the prosecutors in this case did not violate my court order. The government thinks that the district court is in the best position to determine whether or not the prosecutors complied or did not comply with the court order. And on the question, on the question before this court, did the government commit misconduct by intentionally violating a court order? The answer must be no, because the district court repeatedly told prosecutors that they were proceeding within the bounds of what the district court had said was appropriate. I just want to mention one thing on the standard of review as to this claim. We think that it's plain error. And it's important to note that the claims raised below were evidentiary claims. They weren't claims of prosecutorial misconduct. I think an important key point to look at is Seifert's reply brief at pages 6 and 7. They're citing to record its documentary 248, page 7154. That is their site for saying we've preserved this claim. If you read page 7154, it says, we want to strike the testimony of these four patients or declare a mistrial. They are not saying the prosecutors have violated prior court orders. Everything is infected with error, a mistrial no matter what. That is not what they're saying. That was not their claim. Their claim was a more limited evidentiary claim. And they have changed their claims after trial to this prosecutorial misconduct claim, which should be reviewed under the plain error standard. The final point I'd like to make on the prosecutorial misconduct issue is, if you have to reach prejudice, there was no prejudice here. And I want to talk about just, if you think about this as a Venn diagram between the seven high-risk patients that were related to the Title 21 counts and the five low-risk patients who were the focus of the health care fraud claims, there is very little overlap in that Venn diagram. And I think the best authority, the best place to look for that, is go to the government's rebuttal closing. It's page, it's docket entry 249, pages 7, 3, 1, 3 to 7, 3, 1, 5. This is the government distilling down in the last 30 minutes of this case what its proof is on health care fraud in a 17-day trial, or 15-day, whatever it was, 14-day trial. They cite, the government cites to exhibit 2, government exhibit 2H, which is a summary exhibit. That's at appendix 906 and 907. And that is effectively a cheat sheet that maps onto the specific executions in the superseding indictment related to health care fraud. What is the government pointing to in that portion of the rebuttal closing? These were tests that were run on a malfunctioning machine. That's what's going on with these executions. These were tests that weren't run at all during the period in 2020 when Dr. Ein was running the machine. Or they were tests that were run after Seifert even admitted that they were over-testing and he kept on doing the testing. Those are the types of claims that the government was focused on. I don't think I have anything further to say on the misconduct claim, and does the court have any further questions for me? With that, I yield my time back to the court. You may proceed. Counsel just talked about the Hofstetter case. The Hofstetter case, counsel is correct, the district court in that matter allowed evidence of uncharged patient deaths. Before you go there, can you address the preservation issue that public counsel has raised that this sort of prosecutorial misconduct claim that you're pursuing on appeal wasn't preserved below such that we should review it for claim error? Absolutely, Judge Mathis. It was raised in Dr. Seifert's Rule 29 and Rule 33 motion, which is part of that district court record. Even at this charge conference that the government was just discussing, counsel for Dr. Seifert, in making its record, cited two very, very recent district court prosecutorial misconduct cases. The district court in responding spoke in prosecutorial misconduct terms in terms of improper argument before the jury. It was clear that the district court understood that that was a prosecutorial misconduct argument, even if those words were never said. For all of those reasons and with the substantial briefing in the court below, Dr. Seifert's position is that this matter was absolutely preserved, but even if it wasn't on a plain error standard, the result still needs to be the same. Going back to this Hofstetter issue, counsel said if we were before the Hofstetter court, this would have been no problem. The problem with that is we weren't before the Hofstetter court. This district court set a very clear pretrial standard. The evidence was only admissible for intent, and if there was no evidence of intent, it needed to be disregarded. By nature, that makes it inadmissible. The court then abused its discretion by allowing the government to present two experts, multiple family members of these deceased patients, and further abused its discretion in failing to strike that evidence, declare a mistrial, and in denying Dr. Seifert's post-trial motions. For all of those reasons, Hofstetter provides no relief. This court should reverse Dr. Seifert's conviction and remand the case for a new trial. Thank you, counsel. Thank you. I'd like to address the local coverage determination instruction first. I believe counsel stated that their main issue with that instruction, the requested instruction, was that it failed to reference appealability. That's incorrect. The instruction did reference appealability. If you look at our brief, page 44, we list out the specific instruction, the language of the requested instruction, and it includes appealability. Moreover, that is not an issue that the government raised in its brief. It said then that the instruction was bad because it failed to reference that local coverage determinations are given deference. This instruction was a correct statement of the law. The government's failure to identify anything incorrect or inaccurate with the stated instruction should lead this court to reverse for failure to give the instruction. Failing to give the instruction absolutely did impact the outcome of the trial. This is the local coverage determination that set the standard for medical necessity testified by two expert witnesses called by the government and certainly led to the jury's belief as to what is considered appropriate or inappropriate for a urine drug test to be conducted. Was that inconsistent with either Medicaid or the general rule on medical necessity? Well, the issue there is that there is no general rule on medical necessity for urine drug testing, and specifically urine drug testing in pain management. One of the reasons why local coverage determinations are not used for this purpose is because physicians and clinicians should have the ability to determine what is best for their patient based on their own interest, which is what happened in this case. Well, but the whole point was the government is that, you know, there were no individual determinations being made to maximize their profits. They just wanted every urinary test to be at the max. And I would imagine that if the government truly believed that, they would have done an audit of all claims and shown that the claims were identical, that all the tests that were ordered for patients were ordered in identical fashion. That's not the case. The reality is in 2018 the practice started doing something called risk stratification. I believe it was 2018. It's a process by which they determine the risk of the patient, and as a result they will order a test based on the risk. When they started that process, they actually went back and paid back money because they didn't do risk stratification previously, completely rebutting any government argument that there was a lack of patient-specific approach to urine drugs. Wasn't there some evidence that Dr. N wanted his own staff member to classify everybody as a high-risk patient or at least maximize how many were high-risk? I believe that was the testimony related to Dr. Jackson, and it's odd for the government to bring that up because Dr. Jackson wasn't charged with anything. Dr. Jackson certainly testified in the case, but the claims and the tests at issue only related to Dr. Seifert. There were some other claims that were related to other doctors and ordered by other doctors, but there was no indication that Dr. Jackson's claims were all fraudulent because he was forced to push these claims forward and engage in urine drug tests. The government never made that allegation, and so I don't think that Dr. Jackson's testimony is going to carry the day. In fact, it helps the defense. The reality is Dr. Jackson took issue with the approach and decided to change what Dr. Jackson wanted to do. Well, would the LCD instruction really have any bearing on the tests that were run when Dr. N knew that the equipment was faulty, that it was getting unreliable results? Those tests couldn't have been medically necessary if you couldn't rely on the results. Isn't that the case? I appreciate you referencing that, Your Honor, because that is an important issue. It is true that if the government proved, made it a part of their indictment, that the machine was faulty and was able to show that the machine, in fact, was faulty and was able to show that there were no steps taken to rectify the faulty machine, that that could lead to false claims. We concede that point absolutely, but that ignores a few problems with the government's case. First, the faulty machine was the grand pivot by the government. They decided to make that argument despite not charging it. Second, there was a witness called by the defense that testified. Let's back up on that for a second. So it's your position that the government was required to state every item of evidence or way that they were going to prove that these were medically unnecessary tests? Fraud should be proven with particularity, and generally that means that you should lay out your theory of the fraud, and here the theory of the fraud was two-part, that you were over-billing for tests, there was an up-coding, but then also that you were ordering tests that were not medically necessary. No reference in the indictment that tests were ordered, billed, but that the reason that they would have been considered fraudulent was because the machine didn't work properly. But wouldn't that fall in the category of being medically unnecessary, which was articulated in the scheme in the indictment? And medical necessity is determined at the time of ordering. A faulty machine would be at the time of running the test, and so it doesn't drive medical necessity. But there's other evidence that we rely on here, and I'm out of time. I'll let you wrap it up. Okay, thank you. Mr. Dexter, I believe his name was, testified that he was the machine repairman, and he was called by the defense in their case after the government raised this theory. He said the machine was fine. We never heard the testimony of a toxicologist to say that they failed to get proper repairs on the machine, but here's something even more important. These labs have to be certified and audited annually, and there was no reference to any government reports or any audit stating that this was a faulty machine and tests were still being billed for it. This government's theory came out of nowhere, and it was not supported by the evidence at trial. Thank you. Thank you.